IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC VON POOLE,                          *

     Plaintiff,                        *

v.                                       *          Civil Action No. GLR-21-1594

WARDEN R. WEBER, et al.,                 *

     Defendants.                       *

                    ***

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on self-represented Plaintiff Eric Von Poole's Motion for Emergency Preliminary Injunction. (ECF No. 3).[1] The Motion is ripe for disposition and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2021). For the reasons stated below, the Court will deny the Motion and dismiss the Complaint.

---

[1] Also pending before the Court are Poole's Motion for Leave to Proceed in Forma Pauperis (ECF No. 7); a "Motion to Add Additional Defendants and Motion to Now Clarify Corizon Medical et al." ("Motion to Add") (ECF No. 9); a "Motion to Now Name Corizon Listed et al. and Motion to Strike Naming Correctional Officer Cody Gilpin in GLR-21-1594" ("Motion to Amend") (ECF No. 15); a "Motion to Submit Investigative Report Done by Disability Rights of Maryland, in Support of Civil Rights Claims Presented in § 1983" ("First Motion to Submit") (ECF No. 18); and a "Motion to Submit Newly Obtained Maryland Public Information Act in Support of § 1983" ("Second Motion to Submit") (ECF No. 19). For the reasons set forth below, the Motion to Proceed in Forma Pauperis will be granted; the Motion to Add will be granted; the Motion to Amend will be granted in part and denied in part; and the First and Second Motions to Submit will be granted.

# I.    BACKGROUND

## A.    <u>Plaintiff's Allegations</u>

Poole asserts that on June 3, 2021, while incarcerated at Western Correctional Institution ("WCI"), non-party Sergeant Gilman was doing rounds on WCI's Housing Unit 2 tier and was given a note asking that Defendant J. L. Harbaugh, Chief of Security, be notified that Poole's safety was in jeopardy. (Mot. Suspend Order Add WCI Defs. Concert NBCI Defs. Continuation Civil Rights Violation & Order Magistrate Oversee Resolvement Offer Pl. ["Compl."] at 2, ECF No. 1).[2] Poole does not state who authored the letter or who gave it to Gilman. Poole states that WCI officials contacted the Sunni Muslim leadership and made a decision to move Poole to Housing Unit 5, which contained inmates Poole describes as his "support group of [M]uslims." (<u>Id.</u>). After his transfer to Housing Unit 5, Poole received reassurance that he was "back in the Community, and that no harm would come to [him]." (<u>Id.</u>).

Poole alleges that on some unspecified date, he became fearful that WCI prison staff were using "inmate [proxies]" to do the "dirty work on behalf of rogue staff," and was given a "crudely made prison shank" to use for protection. (<u>Id.</u> at 4–5). In April or May 2020, Poole filed an administrative remedy procedure complaint ("ARP") "challenging the 2020 forms that [were] issued by the Chaplain[']s Office" relating to Ramadan. (<u>Id.</u> at 5).

---

[2] Poole initially filed this "Motion to Suspend Order to Add WCI Defendants in Concert with NBCI Defendants Continuation of Civil Rights Violation and Order Magistrate to Oversee a Resolvement Offer by Plaintiff" in a separate case pending before this Court. For reasons set forth in Section I.D, <u>infra</u>, the Court severed the Motion and construes it as the operative Complaint in this action.

He claims that after he filed the ARP, an "unusual chain of events" prompted him to file a notice stating that he feared for his life. (Id.). Poole asserts that Defendants Warden R. Weber, Assistant Warden B. Butler, Chief of Security J. L. Harbaugh, Lt. Wagner, and Officer Reyes have acted in concert with officials at other correctional facilities to "suppress and potentially harm" him through "the use of rogue officials" who have recruited inmate proxies to threaten Poole's life. (Id.).

In his first supplemental filing, Poole explains that on February 28, 2021, he sent a request slip to Acting Chief of Security Llewellyn asking if he would attend a meeting Poole had scheduled with the Chaplain at WCI. (Compl. 1st Suppl. at 1, ECF No. 2). Poole also asked the Imam to attend the meeting. (Id.). Although Llewellyn could not attend, Poole describes the meeting, which concerned the upcoming Ramadan, as "very positive." (Id.). Poole recalls that he later spoke to Llewellyn about Poole's welfare and his institutional job assignment. (Id.). Poole recalls that Llewellyn assured him he would advocate for him concerning his receipt of medical care and advised that there was a planned statewide Chaplain meeting to discuss the 2021 Ramadan holiday. (Id.).

During his fast for Ramadan, Poole was advised "not to argue about the non-service." (Id.). The Imam then told Poole that he was "suspended," and that Poole should practice his Arabic in order to be in "good graces" so that he could come off suspension. (Id.).

On May 5, 2021, Poole was asked to represent another Muslim inmate in a disciplinary hearing. (Id.). Upon his return to the housing unit after the hearing, Poole asked to speak to Reyes to ask him why he had not attended the hearing. (Id. at 1–2). Poole noted

that the hearing officer had advised him that inmates should not be used as proxies for correctional staff. (Id. at 2).

On May 12, 2021, the inmates on Poole's housing unit tier were allowed to go to the barbershop to get haircuts. (Id.). During that trip, an unnamed person told Poole to stop talking to the Imam. (Id.). Poole further recalls that the following day he was "summoned to speak to the building Wasir Umar" and a tier worker named Musa. (Id.). During his conversation with Umar and Musa, Poole was "confronted about calling out actions that [he deemed] as inmate [proxies]." (Id.). On May 14, 2021, Musa told Poole that Poole had been "shunned." (Id.). Poole then received a letter from Wasir Ali informing him that there was a plot on his life "by a campaign being waged to discredit" him. (Id.). However, on May 16, 2021, Poole confronted Umar and two other inmates known as Dee-bo and Ali and he was assured he would not be harmed. (Id.).

On May 18, 2021, after speaking with his attorneys during a Zoom call, Poole was returning to his housing unit when he stopped to talk to inmate Andrew Dicks. (Id.). During his conversation with Dicks, Poole was told to go upstairs and to enter "door number #5." (Id.). After he did so, Poole was met by an "Intel Officer" and attended a meeting with four other people, including the Imam and Wasirs, to discuss "[Poole] talking about inmate [proxies]." (Id.). Poole recalls the others advising him to "cease all talking and work on [his] [A]rabic." (Id.). They also promised Poole they would reinstate him to his job as a barber. (Id.).

On June 1, 2021, Poole was called to the lobby of the housing unit where he met with Musa and Umar. (Id. at 3). Poole followed Musa and Umar through what he describes

as "door number six," where the Imam appeared "with other brothers in tow." (Id.). Poole was then informed that "Intel" wanted to put him on administrative segregation because "kites [were] being dropped on [Poole]," i.e., reports were being made to prison staff about him. (Id.). Poole was further informed of a rumor that he had "dropped a kite" on Musa identifying Musa as a drug dealer who had correctional officers on his payroll. (Id.). The Imam advised Poole that he "was no longer under the protection of the Sunni Community until [Poole] learn[s] the proper pronunciations in [A]rabic because if it is not pronounced right then [Poole] could be cursing Allah." (Id.). That evening, Poole wrote a letter to his attorney and to his former unit manager at North Branch Correctional Institution ("NBCI"). (Id.).

Poole alleges that the following day, he was summoned to his cell door by a member of a Security Threat Group, i.e., a gang, and told to "stay the fuck away from him." (Id.). At that time, Poole believed that there was an ongoing threat against his life and there was a possibility he could be killed. (Id.). Poole asserts that Defendants are violating his First Amendment rights through the use of inmate proxies. (Id.). Specifically, he alleges that Defendants are using inmate threats to discourage him from filing ARPs and silence him in the event his lawsuit goes forward. (Id.).

Poole was transferred from WCI to NBCI on June 8, 2021. (Poole Transfer History at 1, ECF No. 8-1). Through his Motion for Emergency Preliminary Injunction, Poole claims that his transfer to NBCI has "triggered mental health and drug and alcohol problems" and seeks a transfer to either Patuxent Institution ("Patuxent") or a mental health facility. (Mem. Supp. Granting Order Temporarily Transfer Pl. Custody ["P.I. Mot."] at 3,

ECF No. 3-1). He states he was "brutally stabbed on December 1, 2014" and argues he is not an escape risk nor a sex offender, which are favorable factors supporting his transfer request. (Id. at 3, 5). He asks that this Court temporarily require his housing to be "away from the DOC side of DPSCS" and place him "under the custody of DPSCS, Mental Health." (Id. at 6). According to Poole, his requested transfer will ensure he receives treatment for "possible PTSD, Drug & Alcohol, Hip Ailment, and Hypertension." (Id.).

B.    **Response to Show Cause**

In the Response to Show Cause, the Maryland Division of Corrections ("DOC") provides evidence that Poole was interviewed by NBCI staff concerning his claim that his life is endangered by his presence at NBCI and his claim that he requires mental health services. (Resp. Order Show Cause at 4–5, ECF No. 8). Defendants claim they were unaware of Poole's safety and mental health concerns prior to him filing the pending motion. (See Decl. Megan Thrasher ["Thrasher Decl."] ¶ 8, ECF No. 8-2; Decl. Lauren Beitzel ["Beitzel Decl."] ¶ 2, ECF No. 8-4). On July 15, 2020, while he was still at WCI, Poole requested to see a member of the psychology department. (Poole Medical Rs. ["Med. Rs."] at 76, ECF No. 8-3). His request indicated that he was experiencing "[f]lashbacks of [d]epression/and [p]aranoia." (Id.). He stated in the request that while he was at NBCI, he had been placed in an isolation cell "and left there without anything to cope with being isolated." (Id.). Poole expressed that he was experiencing paranoia related to one of his Muslim brothers being stabbed by another Muslim brother. (Id.). He claimed the assault on this unnamed inmate caused him to have flashbacks to December 1, 2014, when he was stabbed. (Id.). He further related that this event, together with his own experience, caused

him to "want to protect [him]self," which is why officers found him with a knife on June 16, 2020. (Id.). According to Poole's request, he was experiencing "these episodes . . . constantly since [he] was aware of the incident, and being on lock-up." (Id.).

In response to his request, Poole was seen by Melanie Gordon, M.S., on July 20, 2020. (Id. at 43). Gordon's progress notes documenting the session with Poole indicate that he had "a recent verbal conflict with an officer which brought up 'past feelings' from an incident at NBCI" relating to his pending lawsuit. (Id.). During the session with Gordon, Poole "displayed good insight and was open to therapeutic intervention." (Id.). Gordon also discussed methods of handling stressful situations appropriately with Poole. (Id.).

When Poole arrived at NBCI, he refused to accept a housing assignment in general population. (Adjustment Hr'g R. at 6–10,[3] ECF No. 6-1). Poole was charged with refusing housing by Officer J. Wolford. (Id. at 7). After Poole told Wolford he could not be housed at NBCI and would not go into general population, Wolford contacted Lt. Bennett and Lt. Brewer. (Id.). Poole claimed to have enemies at NBCI, but could not provide the identities of those enemies or otherwise explain why he believed he had enemies. (Id.). Even after he was informed that his refusal to go into general population would result in an infraction, Poole again refused to go. (Id.).

At the disciplinary hearing concerning the infraction, Poole testified that on June 1, 2021, he attended a meeting at WCI with other inmates and information from that meeting was doctored and given to another inmate. (Id. at 7). The information stated that Poole's

---

[3] Citations to exhibit page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

life was at risk and that he had given information about other inmates. (Id. at 7–8). He claimed that there were inmates at NBCI who were working "in concert with officials at NBCI which puts [his] life in jeopardy here." (Id. at 8). The institutional representative argued that Poole had no documented enemies at NBCI and had not provided the facility with any names of inmates to be added to his enemies list. (Id.). Further, the institutional representative stated that Poole had been "very vague as to the reasons why he cannot be in general population." (Id.). Poole simply told officers that "there's an unforeseen inmate proxy against him." (Id.). Poole was found guilty of the rule violations and given fifteen days of segregation. (Id. at 9).

Megan Thrasher, a Case Management Specialist at NBCI assigned to the Disciplinary Segregation caseload, interviewed Poole on July 22, 2021, after learning that Poole was requesting a transfer to Patuxent because he had unresolved mental health and substance abuse issues. (Thrasher Decl. ¶¶ 1, 6). Thrasher's duties include "identifying whether an inmate can return to general population upon completion of his Disciplinary Segregation sentence." (Thrasher Decl. ¶ 4). To accomplish that task, Thrasher reviews the inmate's enemy alerts, his institutional case file, and "any other available source of information that would document that the inmate's placement into the general population would pose a threat to the inmate or overall security of the institution." (Id. ¶ 4). In that capacity, Thrasher states that she has confirmed that Poole has no known enemies at either NBCI or WCI. (Id. ¶ 5). Poole's assailant who stabbed him in 2014 remains on his documented enemies list but is housed elsewhere in the State. (Id.).

Thrasher opines that Poole's fears are generalized and do not include any specific concern regarding his incarceration at NBCI. (Id. ¶ 7). Based on her assessment and the absence of any documented enemies at NBCI, Thrasher concluded that Poole qualifies for transfer back into general population. (Id.). With respect to Poole's specific request to be transferred to Patuxent, Thrasher advises that an inmate must carry a mental health diagnosis which requires treatment, along with other eligibility criteria, to qualify for transfer to the Correctional Mental Health Program at Patuxent. (Id. ¶¶ 8–9). Thrasher does not determine whether inmates should be transferred to Patuxent to undergo treatment for a mental health condition. (Id. ¶ 9). As such, she discussed Poole's request for a transfer to Patuxent with Lauren Beitzel, an L.C.P.C. at NBCI, who advised her that Poole does not carry a mental health diagnosis and was therefore ineligible for participation in Patuxent's treatment program. (Id. ¶ 10).

On July 28, 2021, after learning that Poole was seeking a transfer to Patuxent, Beitzel met with Poole to discuss his concerns. (Beitzel Decl. ¶ 5). Beitzel is a "Mental Health Professional Counselor – Advanced" at NBCI. (Id. ¶ 1). She states that when Poole was transferred to NBCI on June 8, 2021, she reviewed his chart and found no active or resolved mental health diagnoses in his chart. (Id. ¶ 3). Further, Poole had not contacted the psychology department requesting treatment since being transferred to NBCI. (Id.). Monica Wilt, a psychiatric nurse, also screened Poole upon his arrival to assess whether he presented a suicide risk. (Id. ¶ 4; Med. Rs. at 51–53). At that time, Poole denied having any mental health issues that should be addressed. (Beitzel Decl. ¶ 4; Med. Rs. at 52).

When Beitzel asked Poole about his specific safety and security concerns, Poole brought up his 2014 assault and the recent "attempts to force him to sign Ramadan paperwork while incarcerated at WCI." (Beitzel Decl. ¶ 7). Beitzel recalls that Poole only spoke "generally[] and refused to provide specific details" to support his requests to be transferred to Eastern Correctional Institution ("ECI"), Patuxent, or to obtain an Interstate Corrections Compact transfer to a federal prison. (Id.). Beitzel describes Poole as "articulate and well-organized in thought" and found that he displayed no symptoms of a severe mental illness. (Id. ¶ 8). Additionally, Poole did not mention anything about substance abuse or the need for treatment of such an issue during his conversation with Beitzel. (Id.). Although Poole expressed a need to be in a prison that could accommodate his need for use of a stationary bike and to receive shoe lifts to address issues following his hip replacement, Beitzel's role as a counselor does not include referrals for such medical issues; rather, she can only refer patients to Patuxent for the "inpatient program for inmates in severe psychological distress." (Id. ¶¶ 9–10). Based on her conversation with Poole, Beitzel concluded that he was not in severe psychological distress and did not require a referral to the mental health program at Patuxent. (Id. ¶ 10).

Poole was also screened for medical concerns shortly after he arrived at NBCI. On June 11, 2021, Holly Hoover, N.P., assessed Poole as a "New Transfer." (Med. Rs. at 54). Poole said he was "unhappy with the rehabilitation that he received for his hip" after undergoing a total hip replacement in 2007. (Id.). She noted that "otherwise [Poole] expressed no medical concerns." (Id.). Because Poole has a history of hypertension, Hoover enrolled him in a chronic care clinic to monitor that condition. (Id. at 55).

C.    **Plaintiff's Reply**

In Poole's "Rebuttal to Defendant's Response to Order to Show Cause," he asserts that the Court is being misled. (Pl.'s Rebuttal Def.'s Resp. Order Show Cause ["Reply"] at 1, ECF No. 11). Relevant to his request for injunctive relief and his objection to being transferred to NBCI, Poole states that on June 25, 2018, Asresahegn Getachew, M.D., recommended that Poole be housed at WCI so that he could use the stationary bike and universal exercise equipment in order to rehabilitate his hip after it was replaced. (Id. ¶ 4). Despite this, Poole claims that after his transfer to WCI, he was not allowed to use the exercise equipment for his physical therapy. (Id. ¶¶ 7–8). Poole further states that on December 9, 2019, the Warden at WCI found an ARP he filed regarding access to the equipment meritorious. (Id. ¶ 11). The Warden thus instructed the WCI medical department to provide Poole with in-house physical therapy, an evaluation by a podiatrist to fit Poole with quarter-inch shoe lifts, and the use of the self-managed physical therapy equipment. (Id.). Poole maintains that NBCI does not have the facilities he needs to "self-manage" his physical therapy. (Id. ¶ 12). Poole argues that it is nonsensical for him to remain in WCI or NBCI after he communicated his concerns about the false information being circulated about him, the threats he received, and the fact that information flows freely among senior staff at both prisons. (Id. at 7). He also asserts that his rights were violated at NBCI, which should have prohibited his transfer back to the facility. (Id.).

Poole further argues that his transfer to NBCI was an act of retaliation by officials at WCI because they were aware that he was writing a legal pleading in his cell. (Mem. Law Supp. Pl.'s Rebuttal Def.'s Resp. Order Show Cause ["Reply Mem."] at 2, ECF No.

11-1). In Poole's view, his transfer to NBCI was an adverse action taken against him because all officials involved are aware that NBCI does not have the appropriate facilities to address his chronic pain condition. (Id. at 3). Further, Poole claims the transfer amounted to a failure to protect him, in violation of his constitutional rights, because officials at WCI and NBCI knew the transfer would create a substantial risk that Poole would be exposed to "unforeseen harm" and would "allow [their] former staff and usage of inmate proxy unseen to keep [him] in check and possibly severely harm him." (Id.).

In a subsequent filing, Poole adds that Patuxent houses inmates in the "Maximum I" category, qualifying him for a transfer there. (Part Two Rebuttal Def.'s Resp. Order Show Cause ["Reply Pt. 2."] at 5, ECF No. 13). He maintains that refusing to transfer him to Patuxent is a violation of his Due Process rights under the Fourteenth Amendment. (Id. at 5–6). He asserts that if this Court orders his transfer to Patuxent, the Court would not be micro-managing the prisons; rather, it is the least restrictive means to ensure his rights are not continually violated. (Id. at 6).

## D.    **Procedural Background**

Poole filed his Motion for Emergency Preliminary Injunction on July 1, 2021. (ECF No. 3). Poole initially filed the Motion in a separate pending lawsuit, initiated in 2017, concerning his claims that while previously housed at NBCI, he was the subject of retaliation and was improperly prohibited from attending religious services and denied meals in violation of his First Amendment right to the free exercise of religion and in violation of the Religious Land Use and Institutionalized Persons Act. See Poole v. Bishop, No. GLR-17-1594 (D.Md. filed June 9, 2017) (hereinafter "Poole I"). Because the

allegations contained in Poole's Motion for Emergency Preliminary Injunction related to events that bore little relation to those forming the basis for Poole I, the Court directed the Clerk to sever those claims into a new action. (See June 29, 2021 Order at 1–2, Poole I ECF No. 108).

The Motion for Emergency Preliminary Injunction was accompanied by a "Motion to Suspend Order to Add WCI Defendants in Concert with NBCI Defendants Continuation of Civil Rights Violation and Order Magistrate to Oversee a Resolvement Offer by Plaintiff." (ECF No. 1). Upon determining that the document took the form of a complaint and adequately set forth the facts underlying Poole's allegations against Defendants, the Court construed it as the operative Complaint in this action. (ECF No. 1). The one-count Complaint alleges retaliation in violation of the First Amendment. (Id. ¶¶ 19–20). Poole seeks injunctive relief and attorneys' fees and costs. (Id. at 6).

On July 2, 2021, the Court issued an Order directing counsel for the DOC to respond to Poole's Motion. (ECF No. 4). DOC filed its Response on July 30, 2021, (ECF No. 8), and Poole filed Replies on August 16, 2021 and September 14, 2021, (ECF Nos. 11, 13).

In addition to his Motion, Poole has filed six factual supplements to the Complaint and Motion for Emergency Preliminary Injunction (ECF Nos. 2, 6, 16, 17, 18, 19); a Motion for Leave to Proceed in Forma Pauperis (ECF No. 7); a "Motion to Add Additional Defendants and Motion to Now Clarify Corizon Medical et al." ("Motion to Add") (ECF No. 9); a "Motion to Now Name Corizon Listed et al. and Motion to Strike naming Correctional Officer Cody Gilpin in GLR-21-1594" ("Motion to Amend") (ECF No. 15); a "Motion to Submit Investigative Report Done by Disability Rights of Maryland, in

Support of Civil Rights Claims Presented in § 1983" ("First Motion to Submit") (ECF No. 18); and a Motion to Submit Newly Obtained Maryland Public Information Act in Support of § 1983 ("Second Motion to Submit") (ECF No. 19).

## II.    DISCUSSION

### A.    <u>Injunctive Relief</u>

"A preliminary injunction is an 'extraordinary and drastic remedy.'" <u>See</u> <u>Munaf v. Geren</u>, 553 U.S. 674, 689–90 (2008) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, <u>Federal Practice & Procedure</u> § 2948, at 129 (2d ed. 1995)). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008); <u>see also</u> <u>The Real Truth About Obama, Inc. v. Fed. Election Comm'n</u>, 575 F.3d 342, 346–47 (4th Cir. 2009). To demonstrate a likelihood of irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." <u>Direx Israel, Ltd. v. Breakthrough Med. Grp.</u>, 952 F.2d 802, 812 (4th Cir. 1991). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. <u>See</u> <u>Taylor v. Freeman</u>, 34 F.3d 266, 269 (4th Cir. 1994). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an

extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Winter</u>, 555 U.S. at 22.

> Additionally, in the context of preliminary injunctions sought by prison inmates:

> > Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C. § 3626(a)(2).

The Court construes Poole's Motion as alleging that Defendants are violating the Eighth Amendment by failing to protect him from a known risk of harm. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; <u>see also</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976); <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976); <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016); <u>King v. Rubenstein</u>, 825 F.3d 206, 218 (4th Cir. 2016). It "protects inmates from inhumane treatment and conditions while imprisoned." <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir. 1996).

The Eighth Amendment protects inmates from physical harm committed by fellow inmates "resulting from the deliberate or callous indifference of prison officials to specific known risks of such harm." <u>Pressly v. Hutto</u>, 816 F.2d 977, 979 (4th Cir. 1987). Thus, to prevail on an Eighth Amendment claim of failure to protect from violence, Poole must

establish that Defendants exhibited deliberate or callous indifference to a specific known

risk of harm. As the United States Supreme Court has noted:

> Prison conditions may be restrictive and even harsh, but
> gratuitously allowing the beating or rape of one prisoner by
> another serves no legitimate penological objective, any more
> than it squares with evolving standards of decency. Being
> violently assaulted in prison is simply not part of the penalty
> that criminal offenders pay for their offenses against society.

Farmer v. Brennan, 511 U.S. 825, 833–34 (1994) (internal quotation marks and citations

omitted). For a prison official to be found liable under the Eighth Amendment for denying

an inmate humane conditions of confinement, "the official [must know] of and disregard[]

an excessive risk to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference." Id. at 837; see also Rich v. Bruce, 129 F.3d 336, 338 (4th

Cir. 1997). A two-part inquiry that includes both an objective and a subjective component

must be satisfied before liability is established. See Farmer, 511 U.S. at 834, 837.

Objectively, the prisoner "must establish a serious deprivation of his rights in the

form of a 'serious or significant physical or emotional injury.'" Danser v. Stansberry, 772

F.3d 340, 346 (4th Cir. 2014) (quoting Farmer, 511 U.S. at 834). The objective inquiry

requires this Court to "assess whether society considers the risk that the prisoner complains

of to be so grave that it violates contemporary standards of decency to

expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. 25, 36 (1993).

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently

culpable state of mind" amounting to "'deliberate indifference' to inmate health or

safety." <u>Farmer</u>, 511 U.S. at 834 (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 302–03 (1991)). Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that the officials drew such an inference. <u>Id.</u> at 837. Where prison officials respond reasonably to a risk, they may be found not liable. <u>Id.</u> at 844.

As the Court understands Poole's concerns, he is (a) fearful that rumors falsely identifying him as an informant have traveled from WCI to NBCI, where "rogue" officers have conscripted inmates to do harm to him, and (b) concerned that NBCI does not have exercise equipment and facilities for his use in alleviating pain in his hip. While neither party appears to dispute that Poole's transfer out of WCI was prompted by the threats made against him, Poole's position is that his safety cannot be guaranteed at NBCI given its close proximity to WCI. Much of Poole's concerns, however, appear to be rooted in unspecific suspicions, and efforts by NBCI officials to determine whether an ongoing threat to Poole's safety persists have been continually thwarted by Poole's inability or refusal to describe in detail who and what is behind the purported threats.

The Response to Show Cause relies on familiar refutations of generalized claims of threats to an inmate's safety, i.e., that no specific, known enemy is housed in the same prison with the plaintiff seeking injunctive relief. In the Court's view, where, as here, there is an allegation that a "hit" has been placed on an inmate's life and the inmate is unable to name their would-be assailant, the absence of a specific known enemy in the general population offers little to no assurance that harm will not befall the inmate who is the

17

subject of the hit. But given the absence of detail provided by Poole to prison officials prior to filing his Motion for Emergency Preliminary Injunction, any attempts to thoroughly investigate the basis for his fears and provide a remedy are difficult, if not impossible.

What is clear from the record before the Court is that Poole's stated fears regarding his safety—as articulated to this Court and to officials at NBCI—are, at best, speculative. Poole has provided officials at NBCI and this Court with no factual basis for his belief that there are inmate proxies at NBCI who were recruited by rogue correctional officers to harm him because of a meeting that took place at WCI between Poole and other inmates. If Poole has a fact-based reason to believe that rumors about him that began at WCI have followed him to NBCI, he has not provided that reason to the Court or to officials at NBCI. Under such circumstances, a preliminary injunction requiring Poole's transfer is inappropriate, as it is not the province of this Court to substitute its judgment for that of the expertise of prison officials familiar with the internal processes of prison management. Accordingly, the Court will deny Poole's Motion for Emergency Preliminary Injunction.

## B.      <u>Amendments to the Complaint</u>

Poole's initial pleadings named Weber, Butler, J. L. Harbaugh, Wagner, and Reyes, all of whom work at WCI, as Defendants. (Compl. at 3–4; <u>see also</u> P.I. Mot.). He claimed that these Defendants violated his rights "by the use of rogue officials through the use of inmate and staff [proxies] in concert with the NBCI Defendants to suppress and potentially harm the Plaintiff in the furtherance of redress." (Compl. at 5). Poole's first supplement is a declaration in support of his claims. (<u>See</u> ECF No. 2).

In his second supplement, Poole adds an unspecified claim for monetary damages and adds as Defendants Frank B. Bishop, Commissioner of the Western Regional Prisons; Jeff Nines, Warden of NBCI; Keith Arnold, Assistant Warden at NBCI; Lt. Beeman of the NBCI Intelligence Unit; and Corizon, the health care contractor for Maryland's Division of Correction. (Compl. 2nd Suppl. at 3–4, 11, ECF No. 6).

In the Motion to Add, Poole seeks to add as a Defendant Cody Gilpin, C.O. II. (Mot. Add Add'l Defs. & Mot. Clarify Corizon Medical et al. ["Mot. Add"] at 1–2, ECF No. 9). Poole explains that Officer Gilpin is a correctional officer at NBCI who has harassed him by commenting loudly enough for other inmates to hear that Poole is on disciplinary segregation because he fears for his life. (Id. at 5–8). Poole asserts that this commentary places him in danger of assault by other inmates, but provides no details regarding how the comments have endangered him.

In the First Motion to Submit, Poole provides a report compiled by Disability Rights Maryland entitled, "Beyond Incarceration: Lock Down for Persons with Disabilities." (Disability Rights Md. Report at 1, ECF No. 18-2). The document provides an overview of conditions of incarcerated individuals with disabilities at NBCI and identifies what it describes as constitutional violations relating to "the use of segregation, inadequate services, the failure to accommodate persons with disabilities, and discriminatory practices." The Court will grant Poole's First Motion to Submit, but notes that due to the document's generalized nature and lack of any articulated connection to Poole's claims, it does not substantially impact the Court's view of this dispute.

In his Second Motion to Submit, Poole encloses documents he receives pursuant to a Maryland Public Information Act ("MPIA") request relating to his 2019 ARP. (ECF No. 19-2). The Court will grant the Second Motion to Submit and consider the documents relating to Poole's 2019 ARP in considering Poole's Complaint. However, the Court notes that because the instant Complaint relates only in a general sense to his 2019 ARP, the documents enclosed with Poole's Second Motion to Submit do not alter the Court's decision in this action.

Poole's Motion to Amend seeks to add Asresahegn Getachew, M.D., and "Corizon Collegiate from [July 9,] 2018 to present" as Defendants and to strike Cody Gilpin as a Defendant. (Mot. Name Corizon Listed et al. & Mot. Strike Naming Correctional Officer Cody Gilpin GLR-21-1594 ["Mot. Amend"] at 1, ECF No. 15). The Complaint against Cody Gilpin shall be dismissed. The basis of Poole's claim against Getachew is that on June 25, 2018, Getachew was responsible for a telemedicine appointment wherein Poole was advised that certain chronic care orders issued by the University of Maryland Medical System would be followed and that Poole would be transferred immediately. (Id. at 2). Poole alleges that since his transfer to NBCI, he has not been provided the tools needed to facilitate his physical therapy. (Id.). Poole further alleges, without explanation, that the Corizon Collegiate Panel "was responsible for the furtherance of continuing mode of therapy past approved" and "is still implementing what not to do in furtherance of [their] duties." (Id. at 3).

In a pleading entitled "Declaration of Eric Poole," Poole provides that when he was transferred to NBCI, another inmate was transferred from NBCI to WCI because he is

considered Poole's enemy, "even though in 2012 he signed off in the presence of Mr. White, CCMM, NBCI [and] Capt. G. McAlpine, NBCI." (Decl. Eric Poole ["Poole Decl."] at 1, 3, ECF No. 16). Poole further states that he received an infraction and has remained on segregation since June 8, 2021. (Id. at 2). He adds that he has "inadequate footwear" and is in "severe pain," but that medical staff are not prescribing anything to address the pain. (Id.). Poole reiterates that Getachew has not rescinded the June 25, 2018 order. (Id. at 3). In the same pleading, Poole complains that Thrasher did not return documents he provided for purposes of obtaining copies. (Id. at 7–8). In the attachments to the Declaration, Poole clarifies that his primary medical complaint is that he is being denied appropriate shoes for use with a shoe-lift to address a disparity in the length of his legs. (See ECF Nos. 16-1, 16-2, 16-3, 16-4, 17).

Under Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed.R.Civ.P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). Rule 15 dictates that "[t]he court should freely give leave when justice so requires." (Id.). Where the proposed amendment to the complaint appears to be futile, the Court has discretion to deny leave to amend. Katyle v. Penn Nat. Gaming, Inc. 637 F.3d 462, 471 (4th Cir. 2011) ("[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules."). Here, service of

the Complaint has not yet taken place. Counsel for DOC has simply provided a preliminary response to Poole's Motion for Emergency Preliminary Injunction. Accordingly, Poole's supplements to his Complaint will be permitted, except as set forth in Section II.C, infra.

## C.    Failure to State a Claim

Notwithstanding that the proposed changes to his claims are permitted under Rule 15, 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) require this Court to conduct an initial screening of this Complaint and require dismissal of any complaint that (i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. See Lomax v. Ortiz-Marquez, 140 S.Ct. 1721 (2020). Poole's claims against Defendants Weber, Butler, Harbaugh, Wagner, Reyes, Bishop, Nines, Warden of NBCI; Keith Arnold, Beeman, and Corizon are based solely on their supervisory status over other correctional and medical employees.

While a theory of respondeat superior is a valid theory of liability in other types of claims, it has no application in a complaint filed pursuant to 42 U.S.C. § 1983.[4] See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (explaining that there is no respondeat superior liability under § 1983). Rather, liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of

---

[4] Plaintiff's bare reference to the Americans with Disabilities Act without any supporting facts for such a claim is insufficient to state a claim. Further there is no evidence on this record that Plaintiff is being denied accommodation for a disability.

subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Poole has provided no allegations to support supervisory liability under this standard. The claims against Defendants Weber, Butler, Harbaugh, Wagner, Reyes, Bishop, Nines, Arnold, Beeman, and Corizon are therefore dismissed.

Poole's claim against Getachew implies that Getachew played some role in Poole's transfer from WCI to NBCI. First, this Court takes judicial notice of the fact that medical staff employed by the independent medical care contractor have no power to effectuate a transfer from one correctional facility to another. See, e.g., Ervin v. Wexford, No. ELH-16-3964, 2018 WL 690872, at *3 (D.Md. Feb. 1, 2018) ("Medical Defendants have no authority to effect a transfer for plaintiff[.]"). Rather, the DOC controls institutional assignments. To the extent that Poole claims Getachew has failed to ensure that Poole receives appropriate footwear and has access to equipment needed for his physical therapy, his proposed amendments fail to sufficiently allege that Getachew deliberately refused to

provide Poole with care for a serious medical need. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) (holding that an Eighth Amendment claim for denial of medical care requires demonstration that actions or failure to act amount to deliberate indifference to a serious medical need). Second, Poole's claims against Getachew fail because he does not allege a basis for supervisory liability. The Court will therefore deny Poole's Motion to Amend to the extent it seeks to add Getachew as a Defendant.

Lastly, Poole's claim against "Corizon Collegiate Panel" fails because Poole does not include any factual allegations that would put Corizon on notice of any claim being raised against it. <u>See</u> Fed.R.Civ.P. 8(a), <u>see also</u> <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506, 512 (2002) (holding that complaint allegations must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests"). The Court will deny Poole's Motion to Amend to the extent it seeks to add Corizon Collegiate Panel as a Defendant.

### III.    CONCLUSION

For the reasons stated herein, the Motion for Emergency Preliminary Injunction (ECF No. 3) will be denied; the Motion to Proceed in Forma Pauperis (ECF No. 7) will be granted; the Motion to Add (ECF No. 9) will be granted; the Motion to Amend (ECF No. 15) will be granted in part and denied in part; the First Motion to Submit (ECF No. 18) will be granted; the Second Motion to Submit (ECF No. 19) will be granted; and the Complaint will be dismissed for failure to state a claim. A separate Order follows.

Entered this 18th day of November, 2021.

_____/s/_____
George L. Russell, III
United States District Judge